IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CITY OF STOCKBRIDGE,              )
GEORGIA; ELTON ALEXANDER;         )
JOHN BLOUNT; and URBAN            )
REDEVELOPMENT AGENCY OF           )
THE CITY OF STOCKBRIDGE,          )
                                  )
    **Plaintiffs,**              )
                                  )
**v.**                            )
                                  )
TINA LUNSFORD, in Her Individual  )
and Official Capacities as the Henry  )
County Elections and Registration )
Director; ANDY CALLAWAY, JON      )   **CIVIL ACTION NO.**
KIRKPATRICK, MILDRED              )   **1:18-CV-03961-LMM**
SCHMELZ, DAN RICHARDSON, and      )
ARCH BROWN, in Their Individual   )
and Official Capacities as Members of  )
the Henry County Board of Elections )
and Registration;                 )
                                  )
    **Defendants.**              )
                                  )
                                  )
                                  )
                                  )
                                  )
_____ )

## AMENDED COMPLAINT

Plaintiffs City of Stockbridge, Georgia, the Urban Redevelopment Agency

of the City of Stockbridge, Elton Alexander and John Blount hereby file their

Amended Complaint under Section 2 of the Voting Rights Act of 1965 and pursuant to 42 U.S.C. § 1983 to enforce their rights under the Contract Clause (United States Constitution Art. I, § 10, cl. 1) and the Fourteenth Amendment to the United States Constitution against Defendants for their unlawful and unconstitutional passage and enactment of Acts 548 and 559 of the 2018 Session of the Georgia General Assembly providing for the creation of a new City of Eagle's Landing, Georgia, to be formed by de-annexing approximately half of the existing City of Stockbridge, Georgia.

### **INTRODUCTION**

In 2018, the General Assembly – after earlier failed attempts – passed two pieces of legislation designed to create a new city in Henry County called Eagle's Landing.  In order to do so, the challenged legislation would de-annex about half of the City of Stockbridge's current territory to be included in the new City of Eagle's Landing, if voters in the Eagle's Landing area approve creation of such City by referendum vote.  No one disputes that the City of Stockbridge will suffer financially if the referendum proceeds and is approved by voters who will not face any of the fiscal consequences of their decisions.  No one can deny that, when advocating for the proposed City of Eagle's Landing, supporters testified before the legislature that Stockbridge's changing "demographics" motivated the decision

to create a new city.  And, no one can deny that the proposed City of Eagle's Landing is happening on the heels of a major shift in the City of Stockbridge City Council to one comprised of all African-Americans.

Eagle's Landing supporters' concerns over "demographics" led directly to legislation for a new city that weakens African-American voting strength.  The proposed city will also leave persons remaining in the City of Stockbridge responsible for bonds that the residents of Eagle's Landing benefitted from but will no longer be required to pay.  The Constitution and the Federal Voting Rights Act protect against such abuses of power and racially-motivated legislation.  For these reasons, the Plaintiffs seek equitable relief to prevent the balkanization of Stockbridge to satisfy the will of those who made illegal demographics-based appeals.

## PARTIES

1.     Plaintiffs Elton Alexander and John Blount (the "Voting Plaintiffs") are natural persons who currently reside in the portion of the City of Stockbridge, Georgia, proposed to be de-annexed to the City of Eagle's Landing.

2.     Plaintiff Urban Redevelopment Agency of the City of Stockbridge ("Stockbridge Urban Redevelopment Agency") is a public body corporate and

politic created by Georgia's Urban Redevelopment Law (O.C.G.A. § 31-61-1, *et seq.*).

3.      Plaintiff City of Stockbridge is a municipal corporation formed under the laws of the State of Georgia.

4.      Defendant Tina Lunsford is named in her individual and official capacities as the election superintendent for Henry County, Georgia and is charged with conducting elections in Henry County, including the Referendums called for by Acts 548 and 559.  Defendant Lunsford may be served with process at her office address, 40 Atlanta Street, McDonough, Georgia 30253.

5.      Defendant Andy Callaway is named in his individual and official capacities and is charged with conducting elections in Henry County, including the Referendums called for by Acts 548 and 559. Defendant Callaway may be served with process at his office address, 40 Atlanta Street, McDonough, Georgia 30253.

6.      Defendant Jon Kirkpatrick is named in his individual and official capacities and is charged with conducting elections in Henry County, including the Referendums called for by Acts 548 and 559. Defendant Kirkpatrick may be served with process at his office address, 40 Atlanta Street, McDonough, Georgia 30253.

7.     Defendant Mildred Schmelz is named in her individual and official capacities and is charged with conducting elections in Henry County, including the Referendums called for by Acts 548 and 599. Defendant Schmelz may be served with process at her office address, 40 Atlanta Street, McDonough, Georgia 30253.

8.     Defendant Dan Richardson is named in his individual and official capacities and is charged with conducting elections in Henry County, including the Referendums called for by Acts 548 and 559. Defendant Richardson may be served with process at his office address, 40 Atlanta Street, McDonough, Georgia 30253.

9.     Defendant Arch Brown is named in his individual and official capacities and is charged with conducting elections in Henry County, including the Referendums called for by Acts 548 and 559. Defendant Brown may be served with process at his office address, 40 Atlanta Street, McDonough, Georgia 30253.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction of this action pursuant to (1) 28 U.S.C. § 1343(a), because this action seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act; and (2) 42 U.S.C. § 1983 and 28 U.S.C. § 1331, because this action arises under the Contract Clause of, and the Fourteenth Amendment to, the United States Constitution.

11.    This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

13.    Act 548 of the 2018 Session of the Georgia General Assembly, providing for the incorporation and the corporate limits of the proposed City of Eagle's Landing, was sent by the Georgia General Assembly to Governor Deal on April 5, 2018, and signed into law by Governor Deal on May 8, 2018.

14.    The corporate boundaries of the proposed City of Eagle's Landing include a substantial portion of the territory of the City of Stockbridge.  This fact was known to members of the Georgia General Assembly when they passed Act 548.

15.    Act 559 of the 2018 Session of the Georgia General Assembly, providing for revision of the corporate boundaries of the City of Stockbridge, was sent by the Georgia General Assembly to Governor Deal on April 5, 2018, and signed into law by Governor Deal on May 8, 2018.

**The Demographics of Stockbridge and the Proposed City of Eagle's Landing**

16.    Currently in the City of Stockbridge 53.37% of the voting age population is African-American and 32.5% of the voting age population is white.

17.    In November 2017, on the strength of the Voting Plaintiffs' majority-minority voting bloc, the City of Stockbridge elected its first African-American mayor and its first all-African-American city council in the nearly-100 years of its existence.

18.    If the proposed de-annexation occurs as contemplated by Acts 548 and 559, in the City of Eagle's Landing 43.98% of the voting age population will be African-American and 42.81% of the voting age population will be white.

19.    The African-American residents of the City of Stockbridge who are moved into the proposed City of Eagle's Landing will have their voting strength reduced by 10% and will be moved from a majority-minority voting population to a minority voting population.  By contrast, the white residents of the City of Stockbridge who are moved into the proposed City of Eagle's Landing will have their voting strength increased by 10%.

20.    If the proposed de-annexation occurs as contemplated by Acts 548 and 559, the result will be the reduction in the ability of African-American and

7

other minority voters who are moved out of the City of Stockbridge and into the proposed City of Eagle's Landing to elect representatives of their choice.

## The Passage of the Eagle's Landing Legislation

21.    The procedures the Georgia General Assembly followed in passing H.B. 638 and 639 and S.B. 262 and 263, which gave rise to Acts 548 and 559, departed from the procedural sequence the General Assembly normally follows in such matters.  Indeed, the legislation violated the Georgia State Senate's own rules, and members of the Georgia House of Representatives knew this when they passed Act 548.

22.    Further, decision-makers in the Georgia General Assembly provided virtually no notice of the changes to the City of Stockbridge being proposed by H.B. 638 and 639 and S.B. 262 and 263; they sought to minimize or eliminate public comment; and they expedited the legislative process in ways intended to reduce input from anyone other than the bills' proponents.

23.    The factors the General Assembly considered in passing H.B. 638 and 639 and S.B. 262 and 263 also departed substantively from the factors the General Assembly usually considers when deciding questions of municipal incorporation and de-annexation.

24.     Race was the predominant factor in revising the boundaries of the City of Stockbridge and in creating the proposed City of Eagle's Landing.

25.     Statements and communications involving decision-makers in the Georgia General Assembly indicate they were aware that H.B. 638, H.B. 639, S.B. 262, and S.B. 263 would have a negative effect on the ability of minority voters in the City of Stockbridge to elect representatives of their choice.

26.     White proponents of the City of Eagle's Landing testified during the General Assembly's legislative committee hearings that the current "demographics" of the City of Stockbridge had deterred businesses from coming to the City of Stockbridge and that incorporating the City of Eagle's Landing would change such "demographics" and encourage commercial and other business development there.

27.     The website of the Eagle's Landing Educational Research Committee, an advocacy group for the formation of the City of Eagle's Landing, states, "High end retail and other businesses look at the Demographics before the[y] come into an area to be sure the area can support their products.  The median household income of Stockbridge is approximately $58,000 … Since [the proposed City of Eagle's Landing will have] a median household income of $128,570, they will come and it will help all of Henry County."

28.     White proponents of the City of Eagle's Landing also testified during the General Assembly's legislative committee hearings that their intent was to carve the new City of Eagle's Landing out of the higher-income and commercially thriving portion of the City of Stockbridge, particularly the commercial corridor along and around Eagle's Landing Parkway.

**The Incorporation of Eagle's Landing Will Harm Stockbridge Residents**

29.     According to a report entitled "Stockbridge De-Annexation Fiscal Analysis" prepared by the University of Georgia's Carl Vinson Institute of Government (the "Carl Vinson Report"), the assessed value of residential property currently within the City of Stockbridge is $449,684,236.

30.     If the proposed de-annexation occurs as contemplated by Acts 548 and 559, although the proposed City of Eagle's Landing will take 32% of the City of Stockbridge's population, it will take 48% of the assessed value of the City of Stockbridge's residential property.

31.     The assessed value of commercial property currently within the City of Stockbridge is $292,904,501.

32.     If the proposed de-annexation occurs as contemplated by Acts 548 and 559, the proposed City of Eagle's Landing will take 54% of the assessed value of the City of Stockbridge's commercial property.

10

33.     If the proposed de-annexation occurs as contemplated by Acts 548 and 559, the City of Stockbridge's annual gross revenues will drop from over $9 million to approximately $4.8 million, for a loss of approximately $4.2 million per year.  More than $1.8 million of that lost revenue will be lost local option sales tax revenue from the commercial property moved to the proposed City of Eagle's Landing.

34.     Separate from the proposed de-annexation of the City of Stockbridge to form the City of Eagle's Landing, Acts 548 and 559 also contemplate the annexation of several parcels of property in unincorporated Henry County into the City of Stockbridge, most of which are residential properties.  Because it does not levy real property taxes, the City of Stockbridge will realize no additional revenue from such properties, and it will still suffer a $4.2 million loss in annual revenues as a result of the de-annexation.

## The Stockbridge Urban Redevelopment Agency's Bonds

35.     In 2005 and 2006, Plaintiff Stockbridge Urban Redevelopment Agency borrowed in excess of $17,000,000.00 for the purpose of financing construction of a new Stockbridge City Hall and other public facilities.

36.     Plaintiff Stockbridge Urban Redevelopment Agency issued bonds in three series to secure repayment of the borrowed funds.  Such bonds are known as

"Series 2005 B," "Series 2006 A" and "Series 2006 C" (collectively referred to herein as the "Urban Redevelopment Revenue Bonds").

37.     The Urban Redevelopment Revenue Bonds all mature on February 1, 2031.

38.     When the bonds were issued, Georgia law required the City of Stockbridge to levy and collect taxes sufficient in amount to meet repayment obligations on the bond debt.

39.     The Urban Redevelopment Revenue Bonds are secured by the City of Stockbridge's pledge of its full faith and credit to repay the principal and interest owing on them.

40.     Plaintiffs Stockbridge Urban Redevelopment Agency and the City of Stockbridge are obligated to pay over $1,200,000.00 in principal and interest per year until the bonds mature in 2031.

41.     For the time period beginning January 1, 2019 (when de-annexation would be effective under Acts 548 and 559) and ending when the Urban Redevelopment Revenue Bonds mature, the City of Stockbridge is obligated to pay $15,611,967.00 in principal and interest to the bondholder in order to satisfy the Urban Redevelopment Revenue Bonds.

42.     In pledging its full faith and credit to secure the Urban Redevelopment Revenue Bonds, the City of Stockbridge relied upon anticipated revenues from its commercial properties to fund its obligations under the bonds.

43.     The City of Stockbridge has not imposed an ad valorem property tax in at least the last thirty years.

44.     Revenues from commercial activity in the City of Stockbridge have been sufficient to meet the City's financial obligations, including the repayment of its bonded indebtedness, but such revenues would not be sufficient for such purpose if the proposed de-annexation occurs.

45.     According to the Carl Vinson Report, the proposed de-annexation of property from the City of Stockbridge under Acts 548 and 559 would reduce the City's annual revenues by $4,239.639.00, but the proposed de-annexation would only reduce the City of Stockbridge's annual expenses by an estimated $898,189.00.

46.     Although the proposed City of Eagle's Landing is the beneficiary of some of the improvements funded by the Urban Redevelopment Revenue Bonds, Acts 548 and 559 do not include any provision requiring the proposed City of Eagle's Landing to contribute in any way to the repayment of the bonds.

47.     No provision of Georgia general law would require the proposed City of Eagle's Landing to contribute to repayment of the Urban Redevelopment Revenue Bonds.

48.     Capital One Public Funding, LLC, is currently the holder of 100% of the Urban Redevelopment Revenue Bonds.

49.     Capital One Public Funding, LLC, has placed the City of Stockbridge on notice that, "if SB 262 and 263 take effect the bondholder [has] serious concerns regarding the ability of the City [of Stockbridge] to continue to pay the debt service on the bonds because it will have lost a large portion of its ad valorem tax base."

50.     If de-annexation pursuant to Acts 548 and 559 occurs, the City of Stockbridge would face an annual revenue shortfall of $3,341,450.00.

51.     If de-annexation pursuant to Acts 548 and 559 occurs, the City of Stockbridge would have no alternative other than to impose an ad valorem property tax to raise revenues to meet its obligations for the general operation of the City.

52.     If de-annexation pursuant to Acts 548 and 559 occurs, the total assessed value of real property within the City of Stockbridge would be reduced by half, from $754,980,457.00 to $377,073,998.00.

53.     If de-annexation pursuant to Acts 548 and 559 occurs, the City of Stockbridge would have to apply a millage rate of approximately 11.24 to its remaining real property to maintain its general operations.

54.     If de-annexation pursuant to Acts 548 and 559 occurs, the City of Stockbridge would have to apply an additional millage rate of approximately 3.2 to fund repayment of the Urban Redevelopment Revenue Bonds.

55.     If the proposed de-annexation occurs as contemplated by Acts 548 and 559, the City of Stockbridge will be forced to repay its outstanding bond debt with substantially less tax revenue, thereby increasing the probability the City of Stockbridge will default on its contractual obligations to its bondholders and diminishing the City of Stockbridge's bond credit rating to the benefit of the City of Eagle's Landing.

## COUNT I

## VOTE DILUTION IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965

56.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 55 above as though fully set forth herein.

57.     If the proposed de-annexation occurs as contemplated by Acts 548 and 559, Defendants' actions will have caused the dilution of the Voting Plaintiffs'

minority voting strength and impair their ability to elect the representatives of their choice.

58.    The influence of African-American voters in the affected areas stands to be diminished should the proposed legislation go through.  The Voting Plaintiffs are currently members of a minority group sufficiently large (53.37% of voters in Stockbridge are African-American) and geographically compact (within the current City of Stockbridge) to constitute a majority in a single-member voting district.

59.    The Voting Plaintiffs' minority group is politically cohesive in that it typically votes as a bloc for particular candidates and has the ability to usually elect their preferred candidate, as demonstrated by Stockbridge's election of an all-African-American city council and an African-American mayor.

60.    If the proposed de-annexation occurs as contemplated by Acts 548 and 559, the Voting Plaintiffs – African-American residents of the City of Stockbridge who are moved into the proposed City of Eagle's Landing – will have their voting strength reduced by 10%, and the white residents of the City of Stockbridge who are moved into the proposed City of Eagle's Landing will have their voting strength increased by 10%.  The proposed city of Eagle's Landing will have an African-American voting age population of roughly 44% and will be

separated into four geographic districts, only two of which will be majority African-American.

61.     The non-African-American voters who will be moved to the proposed City of Eagle's Landing vote sufficiently as a bloc to enable the bloc usually to defeat the Voting Plaintiffs' preferred candidate.

62.     Under the totality of the circumstances, the removal of the Voting Plaintiffs from the City of Stockbridge into the proposed City of Eagle's Landing will deprive them of an equal measure of political and electoral opportunity to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate.

63.     If the proposed de-annexation is barred, the Voting Plaintiffs will retain their majority-minority voting strength in the City of Stockbridge and the potential to elect their preferred local officials, and their voting rights will be protected.

64.     By engaging in the acts and omissions alleged herein, Defendants have denied the Voting Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act and will continue to violate those rights absent relief from this Court.

## COUNT II

**CLAIM UNDER 42 U.S.C. § 1983 FOR RACIAL GERRYMANDERING IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION**

65.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 64 above as though fully set forth herein.

66.    If the proposed de-annexation occurs as contemplated by Acts 548 and 559, Defendants' actions, taken under color of state law, will cause the dilution of the Voting Plaintiffs' minority voting strength and impair their ability to elect the representatives of their choice, in violation of the Equal Protection Clause of the Fourteenth Amendment.

67.    The Voting Plaintiffs are currently members of a minority group sufficiently large (53.37%) and geographically compact (within the current City of Stockbridge) to constitute a majority in a single-member voting district.

68.    The Voting Plaintiffs' minority group is politically cohesive in that it typically votes as a bloc for particular candidates.

69.    If the proposed de-annexation occurs as contemplated by Acts 548 and 559, the African-American residents of the City of Stockbridge who are moved into the proposed City of Eagle's Landing will have their voting strength reduced by 10%, and the white residents of the City of Stockbridge who are moved into the

proposed City of Eagle's Landing will have their voting strength increased by 10%.

70.     The non-African-American voters who will be moved to the proposed City of Eagle's Landing vote sufficiently as a bloc to enable the bloc usually to defeat the Voting Plaintiffs' preferred candidate.

71.     Under the totality of the circumstances, the removal of the Voting Plaintiffs from the City of Stockbridge into the proposed City of Eagle's Landing will deprive them of an equal measure of political and electoral opportunity to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate.

72.     There is no legitimate, non-racial reason for the de-annexation of substantial portions of the City of Stockbridge into the proposed City of Eagle's Landing as provided for in Acts 548 and 559.

73.     Acts 548 and 559 were adopted, at least in part, for the purpose of diluting the voting strength of African-American voters, and increasing the voting strength of white voters, who will be moved into the proposed City of Eagle's Landing.

74.     From the outset, Defendants intended to reduce the number of African-American voters and increase the number of white voters in the proposed

City of Eagle's Landing to reduce African-Americans' voting strength and their ability to elect representatives of their choice.  Put simply, race was the predominant factor motivating the supporters of the proposed City of Eagle's Landing.  They made that concern known to the General Assembly, and the legislature passed the legislation anyway.

75.    Race was, therefore, the predominant factor motivating the legislature's decision to carve up the City of Stockbridge and create a new City of Eagle's Landing where African-American votes are diluted.

76.    By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Voting Plaintiffs rights guaranteed to them by the Fourteenth Amendment to the U.S. Constitution and will continue to violate those rights absent relief from this Court.

## **COUNT III**

**CLAIMUNDER 42 U.S.C. § 1983 FOR VIOLATION OF THE CONTRACT CLAUSE OF THE UNITED STATES CONSTITUTION (ART. 1, § 10, CL. 1) AND CLAIM FOR VIOLATION OF THE CONTRACT CLAUSE OF THE GEORGIA CONSTITUTION (ART. I, § 1, ¶ 10)**

77.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 76 above as though fully set forth herein.

78.     The Urban Redevelopment Revenue Bonds constitute a contract between Plaintiffs the City of Stockbridge and the Stockbridge Urban Redevelopment Agency and the bondholder, Capital One Public Funding, LLC.

79.     Plaintiffs the City of Stockbridge and the Stockbridge Urban Redevelopment Agency reasonably relied, in entering into the Urban Redevelopment Revenue Bonds contracts, on a continued and consistent level of revenue stream from commercial businesses and properties, including those along and around Eagle's Landing Parkway, in order to repay the bond obligations to Capital One Public Funding, LLC.

80.     If the proposed de-annexation occurs as contemplated by Acts 548 and 559, the resulting reduction in tax revenue to the City of Stockbridge will substantially impair its and the Stockbridge Urban Redevelopment Agency's ability to satisfy obligations to Capital One Public Funding, LLC under the preexisting Urban Redevelopment Revenue Bonds contracts.

81.     If the proposed de-annexation occurs as contemplated by Acts 548 and 559, Capital One Public Funding, LLC's right to repayment from the City of Stockbridge and the Stockbridge Urban Redevelopment Agency under the preexisting Urban Redevelopment Revenue Bonds contracts will be substantially impaired.

82.    There is no significant and legitimate public purpose behind Acts 548 and 559.

83.    The adjustment of the contractual rights and responsibilities of the City of Stockbridge, the Stockbridge Urban Redevelopment Agency, and Capital One Public Funding, LLC is not based upon reasonable conditions and is not of a character appropriate to the public purpose allegedly justifying the adoption of Acts 548 and 559.

84.    Acts 548 and 559 are thus forbidden by Article 1, Section 10, Clause 1 of the United States Constitution and by Article I, Section 1, Paragraph 10 of the Georgia Constitution, and they are null and void.

85.    By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the City of Stockbridge, the Stockbridge Urban Redevelopment Agency, and Capital One Public Funding, LLC rights guaranteed to them by Article 1, Section 10, Clause 1 of the United States Constitution and by Article I, Section 1, Paragraph 10 of the Georgia Constitution, and will continue to violate those rights absent relief from this Court.

## COUNT IV

## ATTORNEYS' FEES UNDER 42 U.S.C. § 1988

86.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 85 above as though fully set forth herein.

87.     Plaintiffs are entitled to recover from Defendants their attorneys' fees and expenses incurred as a result of Defendants' violations of their constitutional rights, pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray this Court issue them the following relief:

a.      A declaration that Acts 548 and 559 violate Section 2 of the Voting Rights Act; the Fourteenth Amendment to the United States Constitution; Article 1, Section 10, Clause 1 of the United States Constitution; and Article I, Section 1, Paragraph 10 of the Georgia Constitution;

b.      A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering or implementing Acts 548 and 559;

     c.     Plaintiffs' reasonable attorneys' fees, pursuant to statute, and the costs and expenses of maintaining this action, such as expert fees;

     d.     Any additional relief this Court deems just and proper.

Respectfully submitted this 13th day of September, 2018.

BALCH & BINGHAM, LLP

By: /s/ Christopher S. Anulewicz
    Michael J. Bowers
    Georgia Bar No.0 71650
    Christopher S. Anulewicz
    Georgia Bar No. 020914
    ***Attorneys for the Plaintiffs***

    30 Ivan Allen Jr. Blvd. N.W.,
    Suite 700
    Atlanta, Georgia 30308
    Telephone: (404) 261-6020
    Facsimile: (404) 261-3656
    E-Mail: mbowers@balch.com
    E-Mail: canulewicz@balch.com

WILSON, MORTON & DOWNS, LLC

By: /s/ Robert E. Wilson
    Robert E. Wilson
    Georgia Bar No. 768950
    Stephen G. Quinn
    Georgia Bar No. 153012
    Michael J. Williams
    Georgia Bar No. 763239
    ***Attorneys for the Plaintiffs***

    125 Clairemont Avenue
    Two Decatur Town Center,
    Suite 420
    Decatur, Georgia 30030
    Telephone: (404) 377-3638
    Facsimile: (404) 941-3456
    E-Mail: bwilson@wmdlegal.com
    E-Mail: squinn@wmdlegal.com
    E-Mail: mwilliams@wmdlegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been filed with the Court using the CM/ECF system which will automatically send e-mail notifications of such filings to the all attorneys of record on this 13th day of September, 2018.

/s/ Christopher S. Anulewicz
Christopher S. Anulewicz
Georgia Bar No. 020914