IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CITY OF STOCKBRIDGE, GEORGIA; ELTON ALEXANDER; JOHN BLOUNT; and URBAN REDEVELOPMENT AGENCY OF THE CITY OF STOCKBRIDGE, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| TINA LUNSFORD, in Her Individual and Official Capacities as the Henry County Elections and Registration Director; ANDY CALLAWAY, JON KIRKPATRICK, MILDRED SCHMELZ, DAN RICHARDSON, and ARCH BROWN, in Their Individual and Official Capacities as Members of the Henry County Board of Elections and Registration, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 1:18-CV-3961-LMM |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

**I.    INTRODUCTION**

Both U.S. Const. Art. I, § 10, cl. 1 and Georgia Const. Art. 1, §1, ¶10 preclude laws impairing existing contractual obligations. On May 8, 2018, the

Governor of Georgia signed two laws passed by the Georgia General Assembly, Acts 548 and 559 (the "Acts"), that substantially impair $17,000,000 in bond obligations issued by Plaintiff Urban Redevelopment Agency of the City of Stockbridge ("SURA") in 2005 and 2006.  These bonds are currently held by Capital One Public Funding LLC ("COPF") and are secured by the Plaintiff City of Stockbridge's ("Stockbridge") payment obligations.

At the time the bonds were issued, it was contemplated they would be repaid primarily thorough assessments of Stockbridge's commercial property. *Inter alia,* the Acts de-annex approximately 54% of the assessed value of Stockbridge's commercial property, or $158,168,431.00,[1] in order to create a new City of Eagle's Landing ("Eagle's Landing").[2]  The Acts further decrease the total assessed value of all real property in Stockbridge by half, from $754,980,457.00 to

---

[1] The current total assessed value of the commercial property within Stockbridge is $292,904,501.00.  *See* Carl Vinson Institute of Government – The University of Georgia, "Stockbridge De-Annexation Fiscal Analysis" (the "Carl Vinson Analysis", a true and correct copy of which is attached as **Exhibit A**) at 2, and "Supplemental to Stockbridge De-Annexation Fiscal Analysis" (the "Carl Vinson Supplemental", a true and correct copy of which is attached as **Exhibit B**) at 2.  (The Carl Vinson Analysis and the Carl Vinson Supplemental are referred to together as the "Carl Vinson Studies".)

[2] The Acts de-annex 32% of Stockbridge's population and 48% of the assessed value of its residential property.  *See* Carl Vinson Analysis (Ex. A) at 2.  Stockbridge's annual revenues would be cut by $4,239,639.00, but its annual expenses would be cut by only $898,189.00.  *See id.* at 3, 37.

$377,073,998.00. The Acts cede this revenue base to Eagle's Landing, but leave the totality of the debt obligations with a much poorer Stockbridge. The Acts substantially impair the bonds' payment obligations and are unconstitutional.[3]

The Acts will become effective upon garnering more than 50% of the "qualified"[4] votes cast in the upcoming November 6, 2018 referendum to approve Act 548. *See* Act. 548, Sec. 7.13, 7.14; Act 559, Sec. 3-1.[5] Because (1) Plaintiffs have a substantial likelihood of success on the merits, (2) there is no justifiable public interest in permitting the cleaving of more than half of Stockbridge's revenue base while continuing to saddle Stockbridge with the entirety of its bond obligations, and (3) Stockbridge and its citizens will suffer irreparable harm if the referendum proceeds and is certified, Plaintiffs ask the Court pursuant to Fed. R.

---

[3] COPF has filed a separate, related action that is currently pending before this Court. *See Capital One Public Funding, LLC v. Lunsford*, Civil Action File No. 1:18-CV-03938-LMM (the "COPF Action"). COPF also challenges the Acts on the ground they substantially impair the bond obligations at issue in violation of the Contracts Clauses of the U.S. Constitution and the Georgia Constitution.

[4] Only those electors who will be in the proposed new City of Eagle's Landing have a right to vote in this referendum. *See* Act 548, Sec. 7.12 and App'x B. Citizens remaining in Stockbridge have no vote over the destruction of their city. *See* Act. 548, Sec. 7.12 and App'x B; Act 559, Sec. 3-1. There is an "annexation" portion of Act 559 that also requires a referendum, but that portion of Act 559 is not relevant to the present dispute. *See* Act 559, Sec. 2-2.

[5] True and correct copies of Act 548 and Act 559 are attached as **Exhibits C** and **D**, respectively.

Civ. Proc. 65(a) to preliminarily enjoin the scheduled November 6, 2018 referendum, or the certification of the referendum by Defendants if the referendum is allowed to proceed, until a trial on the merits.

## II.   FACTUAL BACKGROUND

In 2005 and 2006, SURA borrowed approximately $17,000,000.00 in order to finance the construction of a new Stockbridge City Hall and other public facilities through SURA's issuance of three series of bonds, Series 2005 B, Series 2006A, Series 2006 C ("the Bonds").  *See* Verified[6] Amended Complaint ("Complaint") ¶¶ 35, 36.  All of these Bonds will mature on February 1, 2031, and they are all secured by Stockbridge's full faith and credit pledge to repay the bonds. *See id.* ¶¶ 37, 39.  At the time of the Bond issuance and the pledge to repay, Stockbridge and SURA relied upon the anticipated revenues from all those commercial properties located within Stockbridge.  *See id.* ¶ 42.  Had those revenues not been available, Stockbridge and SURA would not have issued the Bonds and incurred the indebtedness.[7]  This is because at the time the Bonds were issued, the revenues from commercial activities would have been sufficient to meet

---

[6] The Verification of the Amended Complaint is filed contemporaneously with Plaintiffs' Motion for Preliminary Injunction.

[7] Stockbridge has not imposed an ad valorem property tax in approximately 30 years.  Stockbridge and SURA were relying on revenues from commercial activities to fund the Bonds.  *See id.* ¶¶ 42, 43.

4

the Bond indebtedness along with allowing the provision of other necessary municipal services. *See id.* ¶ 44.

Should the Acts be approved by referendum and the portion of the current territorial limits of Stockbridge be thus de-annexed to form a part of Eagle's Landing, Stockbridge will not be able to meet the Bond indebtedness and provide other necessary municipal services through revenues from commercial activities, as 54% of Stockbridge's commercial properties will have been de-annexed from Stockbridge and its ability to repay the Bonds at all through ad valorem tax revenue would be at substantial risk. *See id.* ¶¶ 32, 44, 50-55.

This is because, should the Acts be ratified, Stockbridge's total revenues will be reduced by $4,239,639.00, while its annual expenses will only be decreased by $898,189.00. *See id.* ¶ 45. The total assessed value of real property within Stockbridge will be reduced by half, from $754,980,457 to $377,073,998.00. *See id.* ¶ 52. According to the Carl Vinson Studies, Stockbridge would need to impose a millage rate of 11.24 on its remaining real property merely to fund its general operations. *See id*. ¶ 53; *see generally* Carl Vinson Analysis (Ex. A); Carl Vinson Supplemental (Ex. B) (net effect of "the de-annexation of territory considered in our previous analysis, the result is a significant loss to the tax base of the city";

Stockbridge will lose over 52% of the tax assessed property value of their commercial property and a total of over 44% of the total tax assessed property value even in the best case scenario of being to annex the additional parcels").

COPF, the current Bond holder, has already placed Stockbridge on notice that, "if [the Acts] take effect the bondholder [has] serious concerns regarding the ability of the City [Stockbridge] to continue to pay the debt service on the bonds because it will have lost a large portion of its ad valorem tax base." Complaint ¶ 49. Not only are COPF, Stockbridge, and the Carl Vinson Institute concerned about Stockbridge's ability to repay the Bonds, but so are bond rating agencies and bond market observers.[8] Thus, not only is Stockbridge's current ability to repay the Bonds at risk, but its ability to borrow money in the future is imperiled.

---

[8] *See* Complaint in COPF Action [Doc. 1] ¶ 68 (referencing "State of Georgia: Proposed de-annexation of Stockbridge, Georgia, is a potential blow to municipalities in the state," MOODY'S, May 14, 2018 ("[d]e-annexation would reduce [Stockbridge's] tax base and [the Acts] include no provisions to reapportion outstanding debt;" "[w]hile Stockbridge may continue to service its debt obligations without interruption following the potential de-annexation ... it could result in a sudden and dramatic change in the city's credit profile"; "[t]he bills are also credit negative for local governments in Georgia generally because they establish a precedent that the state can act to divide local tax bases, potentially lowering the credit quality of one city for the benefit of another"; "[t]his legislation marks the first time that portions of a city are de-annexed in Georgia to create a new city")); *id*. ¶ 69 (referencing May 30, 2018, S&P Global ratings report noting that, if the November 6, 2018 referendum on de-annexation were to pass,

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Preliminary Injunction Standard

"The purpose of the preliminary injunction is to preserve the positions of the parties as best we can until a trial on the merits may be held." *International Fidelity Ins. Co. v. Talbot Construction, Inc.,* No. 1:15-CV-3969-LMM, 2016 WL 8814367, at *3 (N.D. Ga. Apr. 13, 2016) (*quoting Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011)).  To obtain a preliminary injunction, "a movant must establish: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Id.* (citing *Bloedorn,* 631 F.3d at 1229).

---

"Stockbridge would face a weakened leverage position relative to its prospective population, tax base, and budget. Additionally, Stockbridge may face operational challenges," based on the findings from the Carl Vinson Studies); *see also* Shelly Shigo, "Stockbridge Loses One Round in Fight to Avoid De-Annexation," BOND BUYER, July 19, 2018 (available at https://www.bondbuyer.com/news/judge-rules-against-georgia-city-facing-de-annexation) (noting bond agencies' negative reaction to Acts and that Acts could "result in a sudden and dramatic change in the city's credit profile").

7

### B. Plaintiffs Are Likely to Succeed on Their Claim Under 42 U.S.C. § 1983 for Violation of the Contract Clauses of the United States and Georgia Constitutions.

U.S. Const. Art. I, § 10, cl. 1 provides: "No state shall ... pass ... any ... Law impairing the Obligation of Contracts...."  Similarly, Georgia Const. Art. 1, § 1, ¶ 10 provides: "No ... laws impairing the obligation of contract ... shall be passed." These "Contract Clauses" have been interpreted to be co-extensive and they preclude acts that impair existing contractual obligations.  *See, e.g., Hines v. Etheridge*, 173 Ga. 870 (1931); *All Star, Inc. v. Georgia Atlanta Amusements, LLC*, 332 Ga. App. 1, 8 (2015).

To establish a Contract Clause claim, a plaintiff must show (1) a state law has in fact substantially impaired a contractual relationship; (2) the state has no significant and legitimate public purpose behind the law, such as remedying a broad and general social or economic problem; and (3) the adjustment of the rights and responsibilities of the contracting parties is not based upon reasonable conditions and is not of a character appropriate to the public purpose justifying the law's adoption.  *See S&M Brands, Inc. v. Georgia ex rel. Carr*, 230 F. Supp. 3d 1338, 1345 (N.D. Ga. 2017) (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411-13 (1983)).

### 1. The Acts substantially impair the contractual relationship between Plaintiffs Stockbridge and SURA and COPF.

The United States Supreme Court has long held that a statute which restricts a municipality's ability to collect taxes sufficient to repay bonds impairs the bond contract, violates the Contract Clause, and is "a nullity." *Von Hoffman v. City of Quincy*, 71 U.S. 535, 538, 554-55 (1866).

> Where the resource for the payment of the bonds of a municipal corporation is the power of taxation existing when the bonds were issued, any law which withdraws or limits the taxing power, and leaves no adequate means for the payment of the bonds, is forbidden by the constitution of the United States, and is null and void.

*Port of Mobile v. Watson*, 116 U.S. 289, 305 (1886).

When Stockbridge issued the Bonds in 2005 and 2006, Georgia law required it to levy and collect taxes sufficient in amount to meet repayment obligations on the bond debt within 30 years. *See* Complaint ¶¶ 35, 38; Ga. Const. Art. IX, § 5, ¶ VI; *Von Hoffman*, 71 U.S. at 554. In pledging its full faith and credit to secure the Bonds, Stockbridge relied upon actual and anticipated tax revenues from its commercial properties to fund its entire repayment obligations under the Bonds. *See* Complaint ¶ 42. In deciding to purchase the Bonds, COPF relied upon Stockbridge's representations regarding the actual and anticipated tax revenues from its commercial properties being sufficient to fund its repayment of the Bonds. *See* Complaint in COPF Action [Doc. 1] ¶¶ 7, 50.

The Bonds ultimately executed by SURA[9] and Stockbridge and the predecessor to COPF require Stockbridge to pay over $1,200,000.00 in principal and interest per year until the Bonds mature in 2031, for a total of $15,611,967.00. *See* Complaint ¶¶ 40, 41.  Stockbridge's tax revenues have thus far been sufficient to meet its obligations under the Bonds.  *See id*. ¶ 44.  If the proposed de-annexation occurs, this repayment ability is at risk.  *See id*. ¶¶ 45-55.  At the very least, the expectations of the parties to the Bonds at the time they were executed have been substantially altered by the Acts, which take away at least half of Stockbridge's tax base that was previously committed to repayment of the Bonds.

The de-annexation of Stockbridge's property contemplated by the Acts would reduce Stockbridge's annual tax revenues by $4,239,639.00, but would only reduce its annual expenses by a best-estimate of $898,189.00, resulting in an annual revenue shortfall of $3,341,450.00.  *See id*. ¶¶ 45, 50; Carl Vinson Analysis (Ex. A) at 3, 4-6.  Stockbridge will be forced to impose an ad valorem property tax to raise revenues to meet its general financial obligations, but the total assessed value of real property within Stockbridge would be reduced by half, from

---

[9] The provisions of the Bonds and the relationship among SURA, Stockbridge, and COPF are explained thoroughly in the Brief in Support of COPF's Motion for Preliminary Injunction filed on August 31, 2018 [Doc. 8-1], in the COPF Action and they are adopted herein.

$756,736,737 to $378,777,158.  *See* Complaint ¶¶ 51, 52; Carl Vinson Analysis (Ex. A) at 3.  According to the Carl Vinson Studies, Stockbridge would need to impose a millage rate of 11.24 to meet its general obligations.  *See* Complaint ¶ 53.  It is likely the citizens of Stockbridge could not in fact bear this substantial, additional economic burden.

Nothing in the Acts, and no other provision of Georgia law, provides for the apportionment of Stockbridge's Bond obligations to Eagle's Landing, despite the fact the residents and the property to be de-annexed into Eagle's Landing have benefitted from the Bonds.  *See id.* ¶¶ 46, 47.  If the de-annexation contemplated by the Acts occurs, therefore, the likelihood of Stockbridge and SURA defaulting on their contractual obligations to COPF will be substantial and the value of the Bonds will be substantially diminished, thereby impairing the contractual relationship between Plaintiffs Stockbridge and SURA and COPF.  *See id.* ¶ 55.  As noted, COPF has anticipated this result by notifying Stockbridge, "if [Act 548 and Act 559] take effect the bondholder [has] serious concerns regarding the ability of [Stockbridge] to continue to pay the debt service on the bonds because it will have lost a large portion of its ad valorem tax base."  *Id.* ¶ 49.

The Acts are unconstitutional, therefore, because they "detrimentally affect[] the financial framework which induced [COPF] originally to purchase the bonds,

without providing alternative or additional security." *Tyrpak v. Daniels*, 124 Wash. 2d 146, 153-54 (1994) (court affirmed injunction against Port of Camas-Washougal's annexation of Port of Vancouver's territory, finding legislation proposing annexation unconstitutionally impaired Vancouver's general obligation bond contracts where removal of territory would reduce amount of taxes collectible by Vancouver and collection of taxes was principal method for repaying bonds). "The mere existence of [the Acts] adds a 'new and unpredictable element' to the very contours of the municipal corporation with which [COPF] contracted. [The Acts] allow[] one [proposed city] to take land area from another [city] without the latter's consent, effectively reducing its available tax base." 124 Wash. 2d at 154 (quoting *Continental Ill. Nat'l Bank & Trust Co. v. Washington*, 696 F.2d 692, 700 (9th Cir. 1983)) (citation omitted).

> Once having granted certain powers to a municipal corporation, which in turn enters into binding contracts with third parties who have relied on the existence of those powers, the legislature is not free to alter the corporation's ability to perform.

*Id.* (quoting *Continental Ill. Nat'l Bank*, 696 F.2d at 700).

Even if the proposed de-annexation will not cause Stockbridge's tax base to fall below the minimum necessary to satisfy the repayment obligations – which there is a substantial likelihood it will – the excess taxes collected by Stockbridge, over and above those necessary to meet its bond obligations, form additional

security against routine economic fluctuations, making the Bonds more financially attractive. *See id.* at 155. The repeal of such a security provision also impairs an obligation of contract. *See id.*

Moreover, the change in Stockbridge's boundaries and concomitant reduction of its tax base authorized by the Acts occur without the approval, and in fact with the express disapproval, of Stockbridge. *See id.* The Acts permit a select group of "qualified electors" who will reside in Eagle's Landing to cast off their debt obligations, take valuable taxable property, and leave Stockbridge holding the bag of debts without the contemplated revenue to pay those debts. *See id.* The impairment of Stockbridge's tax base permitted by the Acts "is greatly amplified by the Legislature's decision to override the inherent power of [Stockbridge's city councilmembers] to protect the best interests of [Stockbridge] and its bondholder," COPF. *Id.* "It is clear that this [de-]annexation, if approved, would cause a substantial impairment of the [B]ond contracts." *Id.*

        2.    <u>There is no significant and legitimate public purpose behind the Acts.</u>

The public policy justification for a statutory impairment of a contractual obligation applies only if the statute was intended as the State's exercise of its police power to safeguard vital and broad societal interests and not merely as a "benefit to special interests." *All Star, Inc.,* 332 Ga. App. at 9, 12 (quoting *Energy*

13

*Reserves Group,* 459 U.S. at 412) (finding legislature's stated purpose for act ensuring adequate funding for State's HOPE Scholarship and pre-kindergarten programs was legitimate, designed to benefit general welfare of all Georgia's citizens); *see also Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427, 1434 (11th Cir. 1998) (Florida statutes requiring residential line insurers to contribute to catastrophe fund and prohibiting them from entirely withdrawing from Florida insurance market did not unconstitutionally impair existing insurance contracts where statutes served legitimate public purpose of stabilizing Florida economy).

"What is particularly striking in this case is the *absence* of any reasonable police power justification for" the Acts, which were intended specifically to deal with the de-annexation of a substantial portion of Stockbridge into the proposed City of Eagle's Landing. *Tyrpak*, 124 Wash. 2d at 156 (emphasis in original). Allowing de-annexation without apportionment or other equitable relief for validly issued financial obligations of Georgia municipalities is contrary to the public interest because, among other things, it diminishes the collateral and security originally promised to the holders of such obligations and deprives them of existing contractual obligations. "Coupled with [their] limited life span," the Acts cannot be described as merely governing municipal boundaries or protecting a broad societal interest generally, "rather than ... seeking to accommodate a

14

uniquely parochial desire" of a subset of "qualified electors," who want to create their own city unburdened by debt obligations under the Bonds to the detriment of remaining Stockbridge residents. *Id.* at 157 (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 248-49 (1978)). Because there are simply no "broad and general social or economic problem" to be remedied by the Acts or any other significant or legitimate purpose for them, they are unconstitutional and void. *Energy Reserves Group*, 459 U.S. at 412. Plaintiffs are accordingly likely to succeed on the merits of their claims in this action.

### C.   Plaintiffs Will Suffer Irreparable Injury Without an Injunction.

Unless Defendants are enjoined, the referenda called for in the Acts will move forward as scheduled on November 6, 2018. If the Acts are ratified, Stockbridge will lose over half its tax base, the revenues from which Stockbridge and SURA depend on for repayment of the Bonds and COPF relied upon in entering into the Bond contracts. Failure to enjoin the referenda votes, therefore, will result in substantial irreparable injury to Plaintiffs.

### D.   The Injury to Plaintiffs Outweighs Any Harm to Defendants.

Defendants will face no harm if they are required to await this Court's determination of the merits of the Complaint. Stockbridge has been an incorporated municipality since 1920, and those living within the proposed City of

15

Eagle's Landing would not be harmed at all by remaining citizens of Stockbridge or of unincorporated Henry County through the pendency of this action.

Plaintiffs anticipate Defendants will argue the requested injunction against the referenda will create harm by denying the voters their right to vote in the referenda. But the right to vote will merely be delayed, not denied. Indeed, Section 3-2 of Act 559 and Section 7.16 of Act 548 both expressly contemplate a delay in the date of the referenda:

> If it is necessary to delay any action called for in this Act for providential cause or any other reason, it is the intention of the General Assembly that the action be delayed rather than abandoned. Any delay in performing any action under this Act, whether for cause or otherwise, shall not operate to frustrate the overall intent of this Act. Without limiting the generality of the foregoing it is specifically provided that:
>
> (1) If it is not possible to hold the referendum election provided for in Section 7.13 of this Act [and Section 2-2 of Act 559] on the date specified in that section, then such referendum shall be held as soon thereafter as is reasonably practicable; ….

Thus, the General Assembly expressly contemplated the referenda might not occur on November 6, 2018, as currently scheduled; that in such an event the referenda would be held as soon as possible after November 6, 2018; and that any such delay would not deprive citizens in the affected areas of their right to vote in the referenda. If the Court ultimately finds the Acts to be unconstitutional, voters will have no right to vote on ratifying an unconstitutional legislative act. If the Court

finds the Acts to be constitutional, on the other hand, the right to vote will merely be delayed, not denied. Defendants, therefore, will not be harmed at all by issuance of the requested injunction.

### E. The Requested Injunction Will Not Be Adverse to the Public Interest.

Far from being adverse to the public interest, an injunction to protect Plaintiffs' constitutional rights would actually serve that interest, because "the public has a strong interest in assuring that the [State] does not violate the [Constitution]." *Newman v. City of East Point*, 181 F. Supp. 2d 1374, 1381 (N.D. Ga. 2002); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("The public has no interest in enforcing an unconstitutional [law]."); *White v. Baker*, 696 F. Supp. 2d 1289, 1313 (N.D. Ga. 2010) ("because a constitutional right is at issue, the entry of an injunction would not be adverse to the public interest but would in fact advance it"). Consequently, enjoining the referenda until the Court can make a final determination on the merits of Plaintiffs' claims would actually serve the public interest.

From a fiscal perspective an injunction is appropriate as well. If this Court rejects Plaintiffs' request for a preliminary injunction and allows Defendants to proceed with the referendum votes and subsequent de-annexation of Stockbridge only to ultimately hold the Acts unconstitutional, the public costs of reversing the

de-annexation would be substantial. For these reasons, the public would benefit from the requested injunction until the Court can consider and rule upon the merits of Plaintiffs' claims.

## IV. **CONCLUSION**

For the foregoing reasons, Plaintiffs request the Court to enjoin Defendants from taking any action to administer or implement the Acts until a trial may be held on the merits of Plaintiffs' claims.

Respectfully submitted this 13th day of September, 2018.

/s/ Christopher S. Anulewicz
Michael J. Bowers
Georgia Bar No. 71650
Christopher S. Anulewicz
Georgia Bar No. 020914
**BALCH & BINGHAM LLP**
30 Ivan Allen Jr. Blvd. N.W., Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656

*Attorneys for Plaintiffs*

## **CERTIFICATE OF COUNSEL REGARDING FONT SIZE**

Counsel certifies that the foregoing has been prepared using Times New Roman font size 14 in accordance with Local Rules 5.1(B)(3) and 7.1(D).

This 13th day of September, 2018.

/s/ Christopher S. Anulewicz
Christopher S. Anulewicz
Georgia Bar No. 020914

## CERTIFICATE OF SERVICE

I hereby certify that on this the 13th day of September, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notifications of such filing to all attorneys of record on this 13th day of September, 2018.

/s/ Christopher S. Anulewicz
Christopher S. Anulewicz
Georgia Bar No. 020914